UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ESTATE OF ASHER BROWN, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 11-cv-1491 |
| | § | |
| DR. JOHN OGLETREE, et al., | § | |
| | § | |
| Defendants. | § | |
| | § | |

## MEMORANDUM AND ORDER

Pending before the Court is the First Amended Motion to Dismiss of Dr. John Ogletree, President of the Board of Trustees of the Cypress-Fairbanks Independent School District, or, In the Alternative, Motion to Strike (Doc. No. 18).  After considering the motion, the responses thereto, and the applicable law, the Court finds that Defendant's motion must be **DENIED** with respect to Plaintiff's section 1983 and Title IX claims and **GRANTED** with respect to all other claims asserted.

## I.      BACKGROUND

Plaintiff Amy Truong ("Amy"), individually and in her representative capacity for the Estate of Asher Orrin Michael Brown[1] ("Plaintiff" or "Truong"), brings this suit following the suicide of her son, Asher Orrin Michael Brown ("Asher"),[2] a middle school student in the Cy-Fair Independent School District.  In her First Amended Complaint ("Complaint"), Truong

---

[1] Defendants claim that Amy Truong is not qualified to bring this lawsuit on behalf of Asher's estate.  The Court resolves this issue in Plaintiff's favor below.  For simplicity's sake, the Court refers to Amy Truong, in her capacity as plaintiff, and Asher's estate collectively as "Plaintiff" or "Truong."   All references to actions taken by Amy Truong in her role as Asher's mother refer to her as "Amy."
[2] The Court refers to Asher by name because his identity has been revealed in public pleadings.  *See* FED. R. CIV. P. 5.2(a)(3) (providing that, unless the court orders otherwise, in a filing that contains the name of an individual known to be a minor, the filing may include only the minor's initials).

brings claims for relief under 42 U.S.C. § 1983 for violations of the First and Fourteenth Amendments, under Title IX of the Education Amendments of 1972, 86 Stat. 373, as amended, 20 U.S.C. § 1681 *et. seq*, and under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.  (*Id.* ¶ 11.)  Defendant is Dr. John Ogletree, President of the Cy-Fair Independent School District, in his official capacity (hereinafter "CFISD," "the School Board" or "Defendant").[3] (Doc. No. 12, at 1.)

Asher was a student at Hamilton Middle School ("Hamilton") in the Cy-Fair Independent School District.[4]  (*Id.* ¶¶ 6, 15.)  Asher was diagnosed with Asperger's Syndrome, a form of autism, in 2007.  (*Id.* ¶ 94.)  Asher displayed some of the more common side effects of Asperger's syndrome.  For example, he had poor social skills, horrible handwriting, was awkward and clumsy, and had a hard time understanding nuance.  (*Id.*)  In addition, Asher was short for his age, of slight build, and not athletically inclined.  (*Id.* ¶ 95.)  He spoke with a lisp and preferred choir to gym class.  (*Id.*)  Asher was pigeon-toed, which caused him to walk with a slight "sashay."  (*Id.*)  When Amy and David Truong ("David"), Asher's step-father, registered him at Hamilton, they spoke to the sixth grade counselor, Stacey Buetchen ("Buetchen").  (*Id.* ¶ 96.)  They warned her that Asher had been bullied at his prior school and that they were concerned it would happen at Hamilton.  (*Id.* ¶ 97)  They also advised her that Asher suffered from post-traumatic stress disorder ("PTSD") and took medication to manage his anxiety.  (*Id.*) Buetchen assured Amy and David that "there were no bullies" at Hamilton.  (*Id.*)

---

[3] Truong originally asserted her claims against three additional individual defendants, including Dr. David Anthony, Superintendent of CFISD; Ms. Ify Ogwumike, Principal of Hamilton Middle School; and Mr. Alan Durham, Assistant Principal at the Hamilton Middle School.  The Court dismissed the claims against these three individual defendants after Plaintiff decided that she no longer wished to pursue her individual capacity claims.  (Order, Doc. No. 31.)

[4] For purposes of the motion to dismiss, the Court accepts all of Plaintiff's well-pleaded factual allegations as true and views them in the light most favorable to Plaintiff.

But just as Amy and David feared, Asher was often ridiculed and bullied at school.  (*Id.* ¶ 98.)  Most of the bullying incidents related to Asher's physical appearance.  Students called Asher "gay" and joked that he had AIDS.  (*Id.* ¶ 95.)  During physical education classes, students would run in front of Asher on the track and then stop short, causing him to bump into them from behind, and then the students would simulate anal sex.  (*Id.* ¶ 101.)  Such incidents accompanied by derogatory slurs of a sexual nature.[5]  (*Id.*)  On other occasions, specific students—D.K., D.H., K.C., and another student with initials D.K.—would come up behind Asher as he bent down to tie his shoes and simulate anal sex, also accompanied by sexual slurs.[6]  (*Id.* ¶ 102.)  Other students witnessed Asher being bullied during gym class and heard him called "gay," "faggot," "queer," "bitch," and "fuckhead."  (*Id.* ¶ 104.)  Students who rode the school bus with Asher heard other bullies call him "AsherAIDS" and "Assturd."  (*Id.* ¶ 109.)

Other bullying incidents revolved around Asher's religion, Buddhism.  During gym class, a group of bullies would go around asking other students what religion they practiced.  When students replied that they were Christian, the bullies approved.  (*Id.* ¶ 103.)  When Asher responded that he was Buddhist, the bullies would laugh at him and tell him he was going to hell.  (*Id.*)  Students also referred to Asher as "Boodie boy" and made sexually derogatory comments alluding to Asher having sexual intercourse with Buddha.  (*Id.* ¶ 102.)

CFISD had in place "a number of very specific policies, procedures and practices related to bullying, harassment and sexual assault" that the Texas Association of School Boards ("TASB") had helped CFISD develop.  (*Id.* ¶ 61.)  These policies included a "District Improvements Plan" and a site-specific plan encompassing the "Safe Schools" initiative.  (*Id.* ¶

---

[5] Students made comments such as "Hey faggot, quit trying to fuck me" and "Hey guys, Asher is trying to butt fuck me."  (Compl. ¶ 101.)

[6] Students would say "You like this don't you?" and "You fucking faggot, this is what Buddha does to you guys, doesn't he?" and "Have you fucked Buddha today, Boodie boy?"  (Compl. ¶ 102.)

62.)  Both of these plans addressed harassment and bullying.  (*Id.*)  CFISD also had a policy on "Student Welfare," which stated, among other things, that discrimination included harassment or bullying on the basis of gender, disability, or religious preference.  (*Id.* ¶ 63.)  The "Student Welfare" policy also included specific standards governing the investigation of complaints of harassment and bullying.

Upon learning of the harassment Asher was subjected to at school, Amy and David complained to CFISD.  They made repeated attempts to speak with CFISD personnel.  They called the school numerous times, visited the school in person, left notes with the school, and emailed school officials.  (*Id.* ¶¶ 8, 99–100, 110–119.)  They spoke to the sixth, seventh, and eighth grade counselors, the receptionist, the physical education instructor, the assistant principal, and the eighth grade principal, among other school employees.  (*Id.* ¶¶ 96–123.)  Amy's and David's attempts to contact CFISD were continually rebuffed, as phone calls, notes, and emails were never returned.[7]  (*Id.*)

Asher also complained to CFISD himself.  (*Id.* ¶ 7.)  He repeatedly filed incident reports regarding the abuse he suffered in school and in gym class.  (*Id.* ¶ 103, 105, 125.)  After Asher's death, a school district official made light of Asher's complaints, telling an investigator "don't worry, Asher complained about everything, he always filled out incident reports . . . he would even complain that it was a Wednesday or that the wind blew in his face."  (*Id.* ¶ 135.)  Asher's friends also complained on his behalf.  (*Id.* ¶ 8.)  They, too, witnesses the bullying Asher suffered.  (*Id.* ¶¶ 104, 133.) They filed incident reports on his behalf and were aware of Asher's own report filings.  (*Id.* ¶¶ 8, 105–06, 126, 133.)

---

[7] Plaintiff also alleges that evidence of her and David's visits to the school, including video footage from school surveillance cameras and log-in sheets in the administrative office, were purposefully destroyed by school officials following the filing of this lawsuit.  (Compl. ¶ 114.)

Defendant CFISD took no action.  (*Id.* ¶ 9.)  Instead, Asher's coaches avoided Asher's parents in the hall, the school receptionist, Stacey Costolnick ("Costolnick"), refused to let Amy and David meet with the school principal or other CFISD personnel without an appointment, and numerous school officials failed to return the phone calls of Asher's parents.  (*Id.* ¶¶ 112, 115, 118.)  In late September 2010, W.D., another student at Hamilton, threw Asher down a flight of stairs at the school, as other students looked on.  (*Id.*)  Asher told W.D. to apologize, but W.D. did not.  (*Id.*)  Another student observed what happened and filed an incident report, but the school took no action.  (*Id.*)  After more than two years of being victimized by bullies at Hamilton, Asher committed suicide on September 23, 2010.  (*Id.*)

Plaintiff asserts that Defendant CFISD, through its acts and omissions, failed to protect Asher from harm while he attended Hamilton Middle School.  (*Id.* ¶¶ 10–11.)  Plaintiff alleges that CFISD failed to adequately train and supervise staff to properly enforce anti-harassment and anti-bullying policies.  (*Id.* ¶ 64.)  Plaintiff claims that Defendant's inaction violated both federal law and Defendant's own school district policies.  (*Id.*)  Moreover, Defendant's inaction enabled the bullying of Asher to continue and "created a culture that permitted other students to suffer from bullying and harassment."  (*Id.*)

CFISD filed an Amended Motion to Dismiss on August 24, 2011.  (Doc. No. 18.)  After this Court granted an extension of time, Plaintiff filed a response in opposition to the motion to dismiss on October 3, 2011.  (Doc. No. 27.)  Defendant filed a reply on October 13, 2011.  (Doc. No. 29.)

## II.      LEGAL STANDARD

### A.  Legal Standard under Rule 12(b)(1)

A motion to dismiss pursuant to Rule 12(b)(1) challenges a district court's subject matter jurisdiction.  In cases in which a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction is filed, the party seeking to litigate in federal court bears the burden of establishing jurisdiction. *Ramming v. United States,* 281 F.3d 158, 161 (5th Cir. 2001).  It is well settled that a lawsuit must be dismissed if "the court lacks the statutory or constitutional power to adjudicate the case." *See Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998).

A lack of subject matter jurisdiction may occur in "any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming*, 281 F.3d at 161 (5th Cir. 2001) (citing *Barrera-Montenegro v. United States,* 74 F.3d 657, 659 (5th Cir. 1996)).  The Fifth Circuit distinguishes between facial and factual attacks to subject matter jurisdiction. *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).  If the defendant files a Rule 12(b)(1) motion without extrinsic evidence, *i.e.*, a facial attack, the district court is simply required to evaluate the sufficiency of the allegations in the complaint as they are presumed to be true. *Id.*  If the jurisdictional allegations in the complaint are sufficient, the complaint stands. *Id.*  If a defendant brings a factual attack to the district court's subject matter jurisdiction, the defendant must submit affidavits, testimony, or other evidentiary materials along with its Rule 12(b)(1) motion. *Id.*  A factual attack requires a plaintiff "to submit facts through some evidentiary method" and bear "the burden of proving by a preponderance" of the evidence that the district court has subject matter jurisdiction. *Id.*

6

### B.  Legal Standard under Rule 12(b)(6)

A motion to dismiss under Rule 12(b)(6) challenges a complaint on the basis that it fails to state a claim upon which relief may be granted.  FED. R. CIV. P. 12(b)(6).  In deciding a Rule 12(b)(6) motion to dismiss, the court evaluates the sufficiency of the complaint by accepting all well-pleaded facts as true and viewing them in the light most favorable to the plaintiff.  *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)) (internal quotation marks omitted).  To survive a defendant's motion to dismiss, a plaintiff must plead enough facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim has the requisite facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  Mere "labels and conclusions" or "formulaic recitation[s] of the elements of a cause of action" are insufficient to satisfy a plaintiff's obligation to provide grounds for entitlement to relief.  *Twombly*, 550 U.S. at 544. Although a complaint need not contain detailed factual allegations, the factual allegations "must be enough to raise a right to relief above the speculative level." *Id.*

### III.  ANALYSIS

### a.  CFISD's Motion to Dismiss under Rule 12(b)(1)

Defendant raises jurisdictional challenges to Plaintiff's standing and capacity to seek relief on behalf of Asher's estate, to Plaintiff's ability to seek injunctive relief, and to the claim asserted under section 504 of the Rehabilitation Act.[8]

---

[8] Because Defendant has raised both jurisdictional and substantive challenges to Plaintiff's Rehabilitation Act claims, the Court considers Defendant's jurisdictional challenges in its general discussion of the merits of the Rehabilitation Act claim below.

### i.  Whether Amy Truong can sue on behalf of her son's estate

Defendant urges the Court to dismiss this case on jurisdictional grounds, positing that Amy, as Asher's biological mother, does not have capacity to sue on her son's behalf or standing to sue either on her own behalf or on behalf of the estate.  "Although courts and parties have sometimes blurred the distinction between standing and capacity," the Court addresses both issues separately here. *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 848 (Tex. 2005).

### 1.  Standing

Whether a party has standing to bring a lawsuit turns on whether the party has a sufficient relationship with the lawsuit so as to have a "justiciable interest" in the outcome.  6A Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1559 (3d ed. 2011).  Section 1988 guides the standing analysis for claims brought pursuant to the Civil Rights Act statutes, the vehicle through which Plaintiff asserts claims here.  42 U.S.C. § 1988(a).  Section 1988 requires a plaintiff to have standing to sue under the state wrongful death or survival statute in order to bring suit.  *Id.*; *see also Pluet v. Frasier*, 355 F.3d 381, 383–84 (5th Cir. 2004).  Therefore, a party must have standing under the state wrongful death or survival statutes to assert a claim under section 1983.  *See Rhyne v. Henderson County*, 973 F.2d 386, 390–91 (5th Cir. 1992) (finding that standing under the Texas wrongful death and survival statutes is incorporated into the federal civil rights statutes).  This Court must look to Texas law to determine whether Truong has standing here.

The Texas survival statute provides that "[a] personal injury action survives to and in favor of the heirs, legal representatives, and estate of the injured person."  TEX. CIV. PRAC. & REM. CODE § 71.021(b).  The Texas wrongful death statute provides that a wrongful death action exists for the exclusive benefit of the surviving spouse, children, and parents of the deceased, and

that one or more of those individuals may bring the action for the benefit of all.  *Id.* § 71.004(a)-(b).  Amy Truong, as Asher's biological mother, thus has standing to pursue claims in her own capacity under Texas's wrongful death statute.  Because the Complaint pleads that Amy is Asher's biological mother and heir, it adequately pleads standing as to Amy in her individual capacity.

Plaintiff argues that the survival statute conveys standing to Truong also to pursue this lawsuit on behalf of Asher's estate because the case asserts a personal injury as to Asher and because the Complaint names Truong as an heir.  It is clear that "a decedent's survival claim becomes part of h[is] estate at death, [and] it follows that the estate retains a justiciable interest in the survival action."  *Lovato*, 171 S.W.3d at 850.  Thus, while Asher's estate clearly has standing in this survival action, the question of whether Amy may bring suit *on behalf of* the estate is one of capacity.

### 2.  Capacity

Under Texas law, typically the estate's personal representative has the capacity to bring a survival claim.  *See Frazier v. Wynn*, 472 S.W.2d 750, 752 (Tex. 1971) ("[T]he personal representative . . . is ordinarily the only person entitled to sue for the recovery of property belonging to the estate.")  Defendant argues that Amy lacks capacity to sue on behalf of Asher's estate because the Complaint does not plead that she is the duly appointed administrator of Asher's estate.  (Doc. No. 18, at 5.)

The Complaint states that, at the time of filing, Amy Truong had "started the process of being appointed Administrator of the Estate."  (Compl. ¶ 16 n. 2.)  The Court takes judicial notice of the fact that the probate proceeding (application for independent administration) regarding Asher's estate is still ongoing as Case No. 406908 in Harris County Probate Court No.

9

3.   If and when Amy qualifies as the personal representative of Asher's estate, she will undoubtedly have the capacity to bring a claim on behalf of his estate.  *See Rivera v. City of San Antonio*, No. SA-06-CA-235-XR, 2006 WL 3691015, at *4 (W.D. Tex. Dec. 12, 2006) (noting that the decedent's father could bring a claim on behalf of decedent's estate "[i]f, in fact, he qualifies as the representative of the estate of the decedent").  The question is thus whether Amy *currently* has the capacity to bring suit on behalf of her son's estate while her application for appointment as estate administrator is pending but has not yet been approved.

In *Austin Nursing Center v. Lovato*, the spouse of the deceased filed a healthcare liability claim asserting that she was the "Personal Representative" of her husband's estate, even though she had not been adjudicated as representative of the estate at the time of filing.  171 S.W.3d 845, 852 (Tex. 2005).  After the statute of limitations for filing had passed, the surviving spouse was indeed appointed "Independent Administratrix" of the estate.  *Id.*  The Texas Supreme Court concluded that the post-limitations appointment cured the pre-limitations lack of capacity.  *Id.*  In addition, even where no formal adjudication of capacity occurs, the Texas Supreme Court has recognized that, under certain circumstances, heirs "may be entitled to sue on behalf of the decedent's estate."  *Id.* at 851 (citing *Shepherd v. Ledford*, 962 S.W.2d 28, 31 (Tex. 1998)); *see also Flores v. Cameron County, Tex.*, 92 F.3d 258, 272 (5th Cir. 1996) (finding that mother's filing of notice of appointment as administrator of her deceased son's estate was properly treated as a motion to amend the complaint, which related back to the filing of the complaint, thereby making the claim by the estate timely).

Here, the Complaint alleges that Amy Truong is the heir and representative of Asher's estate and that she has applied to be appointed administrator of the estate.  As the Court has confirmed, that proceeding is ongoing and Defendant has raised no facts suggesting any reason

10

for the Court to doubt that the probate proceeding will conclude successfully in Amy's favor. Because the Complaint alleges the proper capacity and Amy Truong is in the process of curing any defect in that capacity, the Court declines to dismiss the Complaint for lack of capacity.

### ii.  Whether Amy Truong has standing to seek injunctive relief

The Complaint seeks injunctive relief in the form of requirements that CFISD adopt specific policies and procedures to benefit other students in the future, that CFISD retain a neutral third-party to conduct a bullying assessment, that the school implement an "Asher's Rule" policy governing the reporting or bullying, and that CFISD erect a marker designating an "Asher's Place" anti-bullying resource center for students in the school library.  (Compl. ¶ 178.) Defendant contends that Plaintiff lacks standing to seek injunctive relief.  (Doc. No. 18, at 6.)  In the opposition to the Defendant's motion to dismiss, Plaintiff represents that she no longer wishes to pursue injunctive relief.  (Doc. No. 27, at 2.)  Because the issue is moot, the Court does not consider Defendant's jurisdictional challenge to injunctive relief here.

### b.  CFISD's Motion to Dismiss under Rule 12(b)(6)

Plaintiff asserts claims for due process and equal protection violations under section 1983, violation of the First Amendment, violation of Title IX, and violation of the Rehabilitation Act.  The Court addresses each of Plaintiff's claims in turn.

### i.  Section 1983 Claims

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, custom, or usage . . ., subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured."  42 U.S.C. § 1983.  Section 1983 is the principal statutory scheme driving several of Plaintiff's claims, as the Complaint relies on the section 1983 vehicle

11

to assert violations of due process and equal protection guaranteed under the Fourteenth Amendment.

### 1.  Due Process Claims

Truong alleges violation of Asher's substantive due process rights under the Fourteenth Amendment.  To state a section 1983 claim for violation of the Due Process Clause, Plaintiff must show that "[s]he has asserted a recognized liberty or property interest within the purview of the Fourteenth Amendment, and that [Asher] was intentionally or recklessly deprived of that interest, even temporarily, under color of state law."  *Walton v. Alexander*, 44 F.3d 1297, 1301–02 (5th Cir. 1995) (en banc).  In general, a state actor such as the School Board is not liable for due process violations carried out by private actors.  *Deshaney v. Winebago County Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989).  However, the School Board could still be liable for the harassment Asher suffered from his peers if Truong adequately alleges that CFISD had a duty to protect Asher from that harassment.

Here, Truong alleges two separate rationales to demonstrate how CFISD violated Asher's due process rights.  First, Plaintiff argues that CFISD violated school policies that governed the appropriate response and investigation procedures for claims of bullying and harassment.  Second, Plaintiff asserts that CFISD violated Asher's due process rights under a state-created danger theory.  The Court addresses Plaintiff's two theories separately.[9]

---

[9] In the motion to dismiss, CFISD argues that the Complaint fails to adequately assert a section 1983 claim under the special relationship theory.  (Doc. No. 18, at 17.)  In the response in opposition, Truong represents that her "complaint does not currently include a section 1983 claim based on a special relationship."  (Doc. No. 27, at 16.)  Although Truong does not currently assert such a claim, the Court is cognizant that a potentially determinative case on the issue of whether public schools have the "special relationship" required for liability under section 1983 is currently scheduled for rehearing en banc before the Fifth Circuit.  *See Doe v. Covington County Sch. Dist.*, 649 F.3d 345, 353 (5th Cir. 2011); *Doe v. Covington Sch. Dist.*, No. 09-60406, 2011 WL 4470009 (5th Cir. Sept. 26, 2011).  Should the Fifth Circuit law develop in Plaintiff's favor, the Court will consider Plaintiff's request to amend her complaint to include a claim under the special relationship theory at a subsequent date.  (Doc. No. 27, at 16.)

*a.   Violation of CFISD Policy*

To state a claim under section 1983, "a plaintiff must (1) allege a violation of rights secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *Lauderdale v. Texas Dep't of Criminal Justice*, 512 F.3d 157, 165 (5th Cir. 2007) (internal quotation marks and citation omitted).   Plaintiff alleges that CFISD violated Asher's constitutional right to life, liberty and bodily integrity when it failed to follow and enforce policies in response to incidents of bullying and harassment against Asher.   (Compl. ¶ 151.)   Defendant argues that the harassment Asher suffered does not rise to the level of a constitutional violation required for a due process claim.   (Doc. No. 18, at 20.)

"[S]choolchildren have a liberty interest in their bodily integrity" that is protected by the Constitution.   *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 450 (5th Cir. 1994) (en banc). "[A]llegations of callous indifference are sufficiently within the ambit of purposeful acts to state a claim of constitutional deprivation under § 1983."   *Lopez v. Houston Indep. Sch. Dist.*, 817 F.2d 351, 355 (5th Cir. 1987) (overruled on other grounds).   While Defendant is correct that the Complaint does not allege that CFISD directly caused Asher's death, the Complaint nonetheless asserts that CFISD's callous inaction allowed damaging conduct to continue, thereby allowing the harassment to escalate to a level that became unbearable to Asher, causing him to take his own life.   In alleging that CFISD deprived Asher of his bodily integrity due to the inaction and indifference of CFISD school officials, Truong adequately alleges a deprivation of Asher's constitutional rights.

In *Monell*, the Supreme Court held that municipalities and other local government entities are included among those persons to whom section 1983 applies.   *Monell v. New York City Dep't*

*of Soc. Servs.*, 436 U.S. 658, 690 (1978).   However, the Court also made it clear that local government entities may not be held liable under a theory of respondeat superior.  *Id.* at 694. Instead, it is only when the injury is traceable to "execution of a government's policy or custom" that a government entity may be held responsible under section 1983.  *Id.*  Specifically, a plaintiff must show that (1) the constitutional violation was caused as the direct result of the execution of an official "custom" or "policy"; (2) the custom or policy was approved or sanctioned by the entity's "final policymaker"; and (3) the final policymaker acted with "deliberate indifference" and the custom or policy was the "moving force" behind the violation. *City of Houston v. Piotrowski*, 237 F.3d 567, 578 (5th Cir. 2001).

In order for Truong to succeed on her section 1983 claim against CFISD, she must first establish that CFISD's official policy or firmly entrenched custom caused the alleged constitutional violation.   *Monell*, 436 U.S. at 694.   An "official policy" is: "(1) a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the [school district's] lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or (2) a persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted or promulgated policy, is so common and well settled as to constitute a custom that fairly represents [the school district] policy."  *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984), *aff'd in relevant part*, 739 F.2d 993 (5th Cir. 1984) (en banc).  "Actual or constructive knowledge of such custom must be attributable to the governing body of the [school district] or to an official to whom that body had delegated policy-making authority."  *Id.*

The Complaint alleges that CFISD violated official policies by failing to act on complaints of student to student harassment.   The Complaint outlines the Texas laws that

required CFISD to have such anti-bullying policies in place.  These laws include H.B. 283, passed in 2005, which was modeled after the federal Safe Schools Act and added sections to the Texas Education Code requiring state school boards to adopt "Student Codes of Conduct" to address bullying and to have methods in place to prevent and intervene in situations of harassment.  (Compl. ¶ 58.)  H.B. 283 further amended the Texas Education Code to require school districts to adopt "discipline management programs" to provide for prevention and education of unwanted verbal aggression and bullying.  (*Id.* ¶ 59.)  Finally, TASB distributed a memorandum to school boards statewide entitled "Harassment And Bullying Policies in Public Schools."  (*Id.* ¶ 60.)  The TASB memorandum explicitly warned school boards that "a school district could be liable when there is student-to-student harassment" where a district's "deliberate[] indifference cause [sic] students to undergo harassment or makes them vulnerable to it, and the harassment takes place in a context subject to the school district's control."  (*Id.*)

The Complaint alleges that CFISD implemented two specific policies following these statewide changes.  First, CFISD completed a "District Improvement Plan" and a specific plan for each school campus.  (Compl. ¶ 62.)  These plans specifically addressed harassment and bullying.  Second, the School Board developed a policy, titled "Student Welfare," that included a section on discrimination and gender-based harassment.  This "Student Welfare" policy delineated "very specific standards" on investigations into complaints of harassment.  (*Id.* ¶ 63.)

Truong claims that, although CFISD paid "lip service" to these policies, it failed to properly train its staff in the procedures required under the policies, which led to school personnel's inaction in response to the formal complaints Asher and his parents filed.  To succeed on a section 1983 claim, Truong will ultimately have to "show some evidence to support that an official policy of the [school board] was the moving force behind" the violation of

Asher's constitutional rights.  *Peterson v. City of Fort Worth, Texas*, 588 F.3d 838, 850 (5th Cir. 2009).  At this stage, however, the Complaint adequately alleges that CFISD had official policies in place ostensibly addressing the appropriate procedures for dealing with the very conduct that led to Asher's death.

Defendant also argues that Plaintiff fails to adequately allege the second prong under *Monell*, *i.e.*, that the policy was approved or sanctioned by a "final policymaker."  Defendant contends that, under Texas law, a "final policymaker" can only refer to a school district's board of trustees, not to the school board.  (Doc. No. 29, at 3.)  Defendant is correct that the Texas Education Code vests the school district's board of trustees with final policymaking authority. *See* TEX. EDUC. CODE § 11.151; *see also Jett v. Dallas Indep. Sch. Dist.*, 7 F.3d 1241, 1245 (1993) ("Texas law is clear that final policymaking authority in an independent school district . . . rests with the district's board of trustees.").  Here, however, Plaintiff has alleged that *the School Board* developed the policies in question.  (Compl. ¶ 62–63.)  Because the Texas Education Code also allows the board of trustees to delegate both decision-making and policy-making authority, the Court cannot say, at this juncture, whether CFISD was acting as the "final policymaker" when it adopted the policies in question here.  *Jett*, 7 F.3d at 1246 (recognizing the important distinction "between those having mere *decisionmaking* authority and those having *policymaking* authority").

The third prong of *Monell* requires Plaintiff to demonstrate that the School Board acted with "deliberate indifference" in violating Asher's constitutional rights.  A state actor acts with deliberate indifference when the actor "consciously disregard[s] a known and excessive risk to the victim's health and safety."  *Hernandez v. Texas Dep't of Protective and Regulatory Servs.*, 380 F.3d 872, 880 (5th Cir. 2004).  Plaintiff has asserted that CFISD was on notice of Asher's

PTSD and anxiety disorders.  (Compl. ¶ 96.)  Plaintiff further alleges that CFISD continually ignored the harassment and bullying against Asher and that school officials rebuffed attempts by Asher and his parents to contact the appropriate school officials to stop the bullying.  For purposes of Rule 12(b)(6), the Complaint thus adequately alleges that CFISD acted with deliberate indifference required for liability under section 1983.

The Complaint pleads sufficient facts to suggest that an official policy was in place, that CFISD approved the policy, and that CFISD acted with deliberate indifference in refusing to enforce the policy, thereby violating Asher's constitutional rights.  Defendant may subsequently prove that the policies did not specifically address the circumstances at hand or that the School Board was not acting as the "final policymaker."  However, the Court declines to dismiss Plaintiff's due process claim based on CFISD's refusal to enforce applicable policies at the motion to dismiss stage, where the parties have not yet had the aid of discovery.

### b.   State-Created Danger Theory

Plaintiff also asserts that CFISD violated Asher's due process right to life, liberty, and bodily integrity under the state-created danger theory.  To prove a violation of due process under the state-created danger theory, a plaintiff must show that (1) state actors created or increased the danger to the plaintiff and that (2) the state actors acted with deliberate indifference.  *Morin v. Moore*, 309 F.3d 316, 322 (5th Cir. 2002) (citation omitted).  A state actor must have culpable knowledge and have engaged in affirmative conduct in "placing the individual in a position of danger, effectively stripping the person of his ability to defend himself, or cutting off potential sources of private aid."  *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 249 (5th Cir. 2003).  To incur liability, the state actor "must have used [its] authority to create an opportunity that would not otherwise have existed for the third party's crime to occur."  *Johnson v. Dallas Indep.*

*Sch. Dist.*, 38 F.3d 198, 201 (5th Cir. 1994). Deliberate indifference "is a stringent standard of fault, beyond mere negligence" and it usually requires a plaintiff to prove "that a state actor disregarded a known or obvious consequence of his actions." *Doe v. San Antonio Indep. Sch. Dist.*, No. 05-50653, 2006 WL 2381963, at *3 (5th Cir. 2006).

In the Complaint, Plaintiff argues that "Hamilton Middle School had a culture that condoned bullying and harassment and looked the other way when it occurred." (Compl. ¶ 90.) "[R]ather than promote a school culture that was sensitive to the issue of bullying and harassment, . . . the School District . . . actually let fester a culture where bullying and harassment was rampant and when it occurred, not only did not know how to respond but looked the other way on multiple occasions." (*Id.* ¶ 91.) In support of these allegations, the Complaint lists at least eleven other students who were allegedly victims of unchecked bullying at Hamilton Middle School. (*Id.* ¶¶ 72–87.) Plaintiff thus asserts that Asher was harmed by Defendant's custom of allowing bullying and harassment to go on unchecked.

The status of the state-created danger theory as a trigger for liability is unclear in the Fifth Circuit. As one court has explained, the district courts are "faced with the situation in which the Fifth Circuit either still has not recognized the viability of the state-created danger doctrine or it has done so (in *Scanlan*), but later panels of the Court have expressly stated that it did not." *Walding v. United States*, No. SA-08-CA-124-XR, 2009 WL 701807, at *11 (W.D. Tex. Mar. 16, 2009). Given the Fifth Circuit's most recent statements on the doctrine, it seems more likely that the Fifth Circuit does not recognize the doctrine at all.[10] *See*, *e.g.*, *Bustos v. Martini Club, Inc.*, 599 F.3d 458, 466 (5th Cir. 2010) ("[T]his circuit has not adopted the state-created danger

---

[10] When there are conflicting panel decisions in the Fifth Circuit, the earliest controls. *See Camacho v. Tex. Workforce Comm'n*, 445 F.3d 407 (5th Cir. 2006) (stating the rule that "the earliest of conflicting panel decisions controls"). Here, where the Fifth Circuit has denied ever explicitly adopting the state-created danger theory and subsequently denied even doing so implicitly, this rule has no effect on the outcome in the instant case.

theory."); *Beltran v. City of El Paso*, 367 F.3d 299, 307 (5th Cir. 2004) (referring to *Scanlan* for the proposition that "[t]his court has consistently refused to recognize a 'state-created-danger' theory of § 1983 liability even where the question of the theory's viability has been squarely presented"); *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 249 (5th Cir. 2003) ("We have never recognized state-created danger as a trigger of State affirmative duties under the Due Process clause."); *Estate of Lance v. Lewisville Indep. Sch. Dist.*, No. 4:11-CV-00032, 2011 WL 4100960, at *9 (E.D. Tex. Aug. 23, 2011) ("The Fifth Circuit has consistently declined to adopt the state-created danger theory to trigger State affirmative duties under the Due Process clause.").  Additionally, the Fifth Circuit has underscored explicitly the importance of its decision not to adopt the doctrine, stating that "[w]here this court has previously spoken on, and refrained from deciding, an issue, a consensus of authority would likely need to be particularly strong and clear before it could support a finding that the legal principle in question was clearly established law in this circuit."  *Breen v. Texas A&M Univ.*, 485 F.3d 325, 340 n. 13 (5th Cir. 2007) ("*Breen I*").  There is no such consensus to date.

In fact, only one unpublished decision has allowed a claim similar to the one advanced here to proceed beyond the motion to dismiss stage on a state-created danger theory.  In *Doe I v. Ennis Indep. Sch. Dist.*, the plaintiffs, four female students at a junior high school, alleged that the school district was aware of a series of sexual assaults, harassment, and bullying incidents by male students but took no action to stop the misconduct.  2007 WL 273550, at *1 (N.D. Tex. Jan. 31, 2007).  After finding that the plaintiffs had adequately alleged specific omissions by the school district that placed the plaintiffs in a position of danger, the court concluded, despite the lack of precedent, that the Fifth Circuit "ha[d] not foreclosed the possibility of approving the

[state-created danger] theory under the appropriate circumstances" and denied the motion to dismiss. *Id.* at *7.

Considering the dearth of Fifth Circuit precedent allowing state-created danger claims to advance, the facts at hand here, and that the *Ennis* case was decided prior to the heightened pleading standards mandated under *Iqbal* and *Twombly*, the Court finds it imprudent to allow Plaintiff's state-created danger claim to advance here.  Even if the state-created danger theory were not completely foreclosed, it is not clear that Plaintiff has alleged sufficient facts to demonstrate that CFISD took *affirmative* action to *create* or *increase* any danger that Asher already faced.  While subsequent discovery may support Plaintiff's argument that CFISD's *inaction* spawned a culture of harassment and bullying among Hamilton Middle School students, it is unclear that inaction can ever serve as the basis for a due process violation under a state-created danger theory.  *See*, *e.g.*, *Rivera*, 349 F.3d at 249–50 (finding that a school district's general lax response to gang activity, which resulted in the death of plaintiff's son, did not demonstrate indifference to the specific danger faced by plaintiffs' son); *Lester v. City of College Station*, No. 03-20906, 2004 WL 1551618, at *1 (5th Cir. 2004) (even if the state-created danger theory applies, liability exists only if the state actor is aware of an immediate danger facing a known victim, not all foreseeable victims); *Mohat v. Mentor Exempted Village Sch. Dist.*, 2011 WL 2174671, at *6–7 (N.D. Ohio June 1, 2011) (finding no allegations that "anyone acting under color of state law committed an affirmative act that created or increased the risk of harm" to a student who committed suicide after being bullied by classmates);

Because the Complaint does not plead facts that make a facially plausible showing that the School Board affirmatively acted to create or increase the danger Asher faced at Hamilton Middle School, and because the state-created danger theory is not recognized in this circuit, the

Court dismisses Plaintiff's section 1983 due process claim to the extent it is based on a state-created danger theory.  As discussed above, Plaintiff may proceed with what she terms as her "direct" 1983 due process claim based on the School Board's alleged failure to follow applicable policies.

## 2.  Equal Protection

To state a claim under the Equal Protection Clause, "a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class."  *Williams v. Bramer*, 180 F.3d 699, 705 (5th Cir. 1999) (quoting *Johnson v. Morel*, 876 F.2d 477, 479 (5th Cir. 1989)) (internal quotation marks omitted).  An equal protection claim based on a "class of one" may succeed "where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *Allegheny Pittsburgh Coal Co. v. County Com'n of Webster Cnty., W. Va.*, 488 U.S. 336 (1989).  However, the challenged government action must "classify or distinguish between two or more relevant persons or groups"; if it does not, "then the action—even if irrational—does not deny" equal protection under the law.  *Johnson v. Rodriguez*, 110 F.3d 299, 306 (5th Cir. 1997) (quoting *Brennan v. Stewart*, 834 F.2d 1248, 1257 (5th Cir. 1988)) (internal quotation marks omitted).

Truong makes two equal protection arguments.  First, Truong argues that CFISD "singularly discriminated" against Asher as a class of one by failing to follow CFISD policies in response to incidents of bullying and harassment.  (Compl. ¶ 151.)  Second, Truong asserts that that CFISD discriminated against Asher on the basis of his gender, thereby violating the Equal Protection Clause.  (*Id.* ¶ 152.)  Truong has failed to adequately plead an equal protection claim on either of these bases.  With respect to the class of one theory, the Complaint contains no

allegations that CFISD *followed* applicable policies and procedures in response to incidents of bullying and harassment of other students.  To the contrary, the Complaint suggests that CFISD refused to intervene in instances of bullying against other students as well.  (Compl. ¶¶ 72–90.)  Absent allegations that other, similarly situated students were treated differently, Truong's equal protection claim must fail.  *See*, *e.g.*, *Hooker v. Dallas Indep. Scho. Dist.*, 2010 WL 4025877, at *8 (N.D. Tex. Oct. 13, 2010) (dismissing equal protection claim where plaintiffs failed to allege that they were treated differently from others similarly situated).

Truong's gender-based equal protection claim must fail too.  The Complaint alleges that CFISD discriminated against Asher on the basis of his gender by failing to follow Board policies in response to incidents of bullying and harassment.  (Compl. ¶ 152.)  However, the Complaint fails to plead sufficient facts to support this claim.  The Complaint provides a lengthy list of other students at CFISD schools who allegedly suffered from the "culture" of bullying and harassment.  (*Id.* ¶¶ 64–93.)  The list includes incidents of allegedly unchecked bullying carried out against both girls (*Id.* ¶¶ 66, 75–76, 81) and boys (*Id.* ¶¶ 69–70, 72, 74, 77–78, 80, 84–85).  The Complaint thus fails to state a plausible equal protection claim because it does not allege that CFISD failed to follow polices regarding bullying and harassment when boys bullied another boy, but acted differently, *e.g.*, by following Board policies, when girls bullied another girl or when boys or girls bullied a student of the opposite sex.  Because Truong has not pleaded facts to demonstrate how CFISD acted differently in response to other incidents of bullying perpetrated by female students or against a female victim, Plaintiff has not stated a claim for a violation of the Equal Protection Clause.

### 3.  First Amendment

The Complaint asserts a claim for violation of the First Amendment.  (Compl. ¶¶ 11, 158.)  As Defendant correctly points out, nowhere does the Complaint specify whether Plaintiff seeks damages for a free speech violation or a religion claim.  Other than asserting that Asher was Buddhist and that some of the sexual innuendo and slurs made by other students referenced Asher's religion, the Complaint does not allege how CFISD maintained a policy of discrimination based on religion.  Plaintiff's response in opposition represents that "Truong no longer wishes to pursue certain remedies" and that the response "therefore omits argument as to issues addressed . . . that are mooted by Truong's election in this regard."  (Doc. No. 27, at 8.)  Because Plaintiff's response makes no reference to the First Amendment claim advanced in the Complaint, the Court assumes that Plaintiff no longer wishes to pursue the First Amendment claim and dismisses the claim accordingly.

### ii.  Title IX Claim

Title IX provides that no person, "shall on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance."  20 U.S.C. § 1681(a).  The purpose of Title IX is to prevent recipients of federal financial assistance from using the funds in a discriminatory manner.  Although the statute itself does not provide for private enforcement, the Supreme Court has interpreted Title IX's prohibitions on federal funding recipients to include a private right of action.  *See Franklin v. Gwinnett County Pub. Schs.*, 503 U.S. 60, 76 (1992).

Title IX seeks to prevent gender-based student on student harassment, and "[s]ame-sex sexual harassment is actionable under title IX."  *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir. 2011) (citing *Doe v. Dall. Indep. Scho. Dist.*, 153 F.3d

23

211, 219 (5th Cir. 1998)).  Specifically, a school district recipient of federal funds may be liable for student on student harassment where: (1) the school district has actual knowledge of the harassment; (2) the harasser is under the school district's control; (3) the harassment is based on the victim's sex; (4) the harassment is "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit; and (5) the school district is deliberately indifferent to the harassment.  *Id.*  For offensive conduct to be considered "based on sex" for purposes of Title IX, the conduct must be more than "merely tinged with offensive sexual connotations."  *Id.* (quoting *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 66 (1st Cir. 2002)).  In order to be found "deliberately indifferent," a school district's action must be "clearly unreasonable in light of the circumstances."  *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 640–41 (1999).  Further, the school district's actions must "subject" the student to harassment or, at a minimum, make the victim vulnerable to harassment.  *Id.*

Truong alleges that CFISD's failure to have policies and procedures in place to ensure that Asher was not a victim of gender-based harassment, failure to enforce the policies that were in place, and failure to respond to incidents of gender-based harassment that Asher suffered at the hands of his fellow students subjected Asher to a hostile educational environment in violation of Title IX.  (Compl. ¶¶ 159–162.)  Defendant argues that Plaintiff's Title IX claim fails as a matter of law because the failure to promulgate policies does not rise to the level of *intentional* discrimination required for Title IX liability.  *See Gebser v. Lago Vista Indep. Scho. Dist.*, 524 U.S. 274, 292 (1998)).  Defendant also argues that Truong merely advances a "generic hostile environment" claim instead of a harassment claim "based on sex," as required under Title IX. (Doc. No. 18, at 35.)

24

1. *Actual Knowledge*

In order for Truong to succeed on her Title IX claim against CFISD, she must first show that the School Board had actual knowledge of the harassment Asher suffered.  Defendants argue that the Complaint does not allege that an official with authority to institute corrective measures knew about the sex-based harassment.  (Doc. No. 18, at 36.)  Specifically, Defendant urges the Court to adopt a narrow reading of *Davis v. Monroe County Board of Education* and suggests that actual notice requires that the school *principal* be informed of harassment before a school board can be deemed to have the "actual knowledge" required under Title IX.  (*Id.*)

The Complaint alleges that Amy and David made numerous attempts to communicate with a wide range of CFISD employees about the harassment Asher faced at school. Specifically, Amy and David spoke to Buetchen, the sixth grade counselor, when Asher started at Hamilton Middle School and alerted her to their concerns about bullying.  (Compl. ¶ 96.) David repeatedly tried to talk to personnel in the school's main office, but was always rebuffed by Costolnick, the receptionist, who told David that he could not meet with someone without an appointment or because he was not Asher's biological father.  (*Id.* ¶¶ 99, 112–13.)  Amy and David wrote several notes "to the school," which Asher delivered in person.  (*Id.* ¶¶ 100, 112.) Asher himself filed complaints with the "school administration" and filled out numerous incident reports following instances of bullying.  (*Id.* ¶¶ 102, 105.)  Other students who witnesses Asher's bullying filed incident reports on Asher's behalf.  (*Id.* ¶ 106.)  Asher reported incidents to his gym coaches.  (*Id.* ¶¶ 103, 110.)  David made several additional attempts to speak with the athletic instructors, but was unsuccessful in speaking to anyone directly.  (*Id.* ¶¶ 112, 115.) David also left notes with Costolnick requesting that CFISD staff contact him about the bullying concerns.  (*Id.* ¶ 113.)  Amy left a voicemail with Assistant Principal Alan Durham ("Durham").

25

Durham did call Amy back on one occasion and promised to investigate her concerns, but Amy never received word of the results of the investigation or whether the investigation had occurred at all.  (*Id.* ¶¶ 116–17.)  Truong also spoke directly to the seventh grade counselor, Mr. Hughes, and eighth grade counselor, Kelly Zeutschell.  (*Id.* ¶¶ 119–22.)  Truong also spoke to the eighth grade principal.  (*Id.* ¶ 123.)

Despite the Plaintiff's numerous attempts to contact CFISD personnel, Defendant argues that CFISD did not receive actual notice of the bullying Asher faced because the "principal" was not notified.  (Doc. No. 18, at 36.)  The particular job title or principal" is simply not given the weight in the case law that Defendant suggests.  While the relevant school employee in the *Davis* case was the school principal, the Supreme Court did not suggest that the school principal was the *only* relevant employee for purposes of Title IX notice analysis.  *Davis*, 526 U.S. at 646–48.  Further, since the *Davis* decision, the Supreme Court has further elaborated that "a Title IX plaintiff can establish school district liability by showing that a single school district administrator with authority to take corrective action" responds with deliberate indifference, nowhere providing as narrow a list of employees as Defendant suggests.  *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009).  Finally, even if Defendant's narrow standard were appropriate, the Court does not see why the alleged conversations with "Assistant Principal" Durham and the "eighth grade principal" would be insufficient to put CFISD on notice for purposes of Title IX.  (Compl. ¶¶ 116–17, 123.)

The Complaint alleges that Amy attempted to contact CFISD through a variety of means, including in person and through telephone calls, emails, and handwritten notes.  In addition, Asher allegedly filed incident reports with the school administration, thereby making use of the very system CFISD mandated for reporting harassment and bullying.  The Complaint further

alleges that phone calls and other communications went unreturned and that in-person visits were repeatedly rebuffed by a receptionist who essentially stonewalled Truong's access to higher-ups in the school administration.  CFISD cannot now escape liability by pointing to the success of its affirmative efforts to thwart Asher and his parents' access to the "appropriate school officials," such as the principal.[11]  Further, even under Defendant's preferred test, the Complaint alleges that Truong made contact via telephone with the Assistant Principal, Alan Durham, and the eigth grade principal, Mr. Bilstein, and expressed her concerns to both individuals.  (Compl. ¶¶ 116–17, 123.)  Taking into account all of the allegations, the Complaint adequately alleges that relevant school officials within CFISD were aware of the harassment Asher faced and, therefore, that CFISD had actual knowledge for purposes of Title IX analysis.

### 2.  Harassers were under CFISD's control

To succeed on her Title IX claim, Truong also must demonstrate that Asher's harassers were under CFISD's control.  As the Supreme Court has explained, the location of the harassment is a relevant factor in determining whether the harassment is deemed to have taken place "under" the "operation" of a funding recipient for Title IX liability purposes.  *See Davis*, 526 U.S. at 645.  Harassment that occurs "during school hours and on school grounds," especially misconduct that occurs "in the classroom," supports a finding that a school board "exercises significant control over the harasser."  *Id.; see also Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie County v. Earls*, 536 U.S. 822, 830–31 (2002) (allowing blanket school drug testing prior to student participation in extracurricular activities because of the limited privacy interests students enjoy "in a public school environment where the State is responsible

---

[11] The Complaint further alleges that, following Asher's suicide, CFISD employees admitted to destroying school records that would have evidenced Amy's and David's attempts to make contact with the school, such as visitor log-in sheets, security video footage, and the incident reports that Asher filed with the school.  (Compl. ¶¶ 114, 134–36.)  Because the Complaint adequately alleges that Amy and David contacted CFISD on numerous occasions, the Court does not address Plaintiff's destruction of evidence concerns at this juncture.

for maintaining discipline, health, and safety" and where "students [are] subjected to greater controls that those appropriate for adults"); *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 655 (1995) (observing "that the nature of [the State's] power [over public schoolchildren] is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults."); *New Jersey v. T.L.O.*, 469 U.S. 325, 342 (1985) ("The maintenance of discipline in the schools requires not only that students be restrained from assaulting one another, abusing drugs and alcohol, and committing other crimes, but also that students conform themselves to the standards of conduct prescribed by school authorities.").

Here, the Complaint alleges that Asher was repeatedly subjected to bullying and harassment based on his sex on school grounds, including during gym class, on the school track, in the lunchroom, in the school hallways, and in the classroom—including during state-mandated testing—and at other points during the school day.  (Compl. ¶¶ 104, 101, 125, 133.)  The Complaint thus sufficiently alleges that the harassers were under CFISD's control.

### 3.   *Severe, pervasive, and objectively offensive conduct "based on sex"*

In order to state a claim for liability under Title IX, a plaintiff must allege harassment rising to the level of "severe, pervasive, and objectively offensive conduct."  *Davis*, 526 U.S. at 651–53.  The conduct at issue also must constitute "offensive behavior based on sex, rather than personal animus."  *Sanches*, 2010 WL 445939, at *2; *see also Oncale v. Sundowner Offshore Servs., Inc*., 523 U.S. 75, 81 (1998) (holding that in same-sex harassment cases, as in all sexual harassment cases, the plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimination . . . because of . . . sex'").  Defendant argues that the incidents of harassment that Truong alleges included

"most[ly] . . . conclusory references to 'bullying' and 'name calling.'"  (Doc. No. 18, at 36.)
Defendant also suggests that the harassment was not overtly sexual.  (*Id.*)  The Court disagrees.

While the Complaint states that Asher was initially picked on after he transferred into
CFISD because he was the "new kid" and "not as privileged" as other students, the bullying soon
transformed into conduct, both oral and physical, aimed solely at Asher's sex.  (Compl. ¶ 98.)
On numerous occasions while Asher was running on the track during gym class, other boys
would run up to Asher and then stop short into front of him, causing Asher to run into the boy
and "simulate anal intercourse."  (Compl. ¶ 101.)  During the incidents on the track, students
insulted him, calling out, "Hey faggot, quit trying to fuck me" and "Hey guys, Asher is trying to
butt fuck me."  (*Id.*)  Similar incidents occurred whenever Asher tied his shoes.  As Asher bent
down, multiple students (the Complaint names at least four) would come up behind him,
simulate anal sex, and yell out, "You like this don't you? You fucking faggot. Is this what
Buddha does to you guys, doesn't he? Have you fucked Buddha today, Boodie boy?"  (*Id.* ¶
102.)  Asher was also derided on multiple occasions, including during gym class, with slurs such
as "gay," "faggot," "queer," "bitch," and "fuckhead."  (*Id.* ¶¶ 95, 104.)  In the school bus on the
way to school, students called Asher names such as "AsherAIDS," "Assturd," and "Boodie boy."
(*Id.* ¶ 109.)  In the lunchroom, students accused Asher of having sex with other boys.  (*Id.* ¶ 123.)
At school, other students joked that Asher had AIDS, again insinuating that Asher was gay by
making reference to his slight build and effeminate appearance.  (*Id.* ¶ 95.)

Almost every incident of alleged harassment was overtly sexual or involved sexual
innuendo, and the Complaint adequately alleges that students' harassment of Asher was based on
their perception that Asher was gay.  *See, e.g.*, *Ray v. Antioch Unified Sch. Dist.*, 107 F. Supp. 2d
1165, 1170 (N.D. Cal. 2000) (finding "no material difference between the instance in which a

female student is subject to unwelcome sexual comments and advances due to her harasser's perception that she is a sexual object, and the instances in which a male student is insulted and abused due to his harasser's perception that he is homosexual" because, "[i]n both instances, the conduct is a heinous response to the harasser's perception of the victim's sexuality").

The Complaint also adequately pleads instances of severe, pervasive, and objectively offensive harassment.  As other courts have recognized, sexually derogatory slurs and practices are sufficient to rise to the level of offensive conduct contemplated by the Supreme Court in *Davis*.  *See*, *e.g.*, *Patterson v. Hudson Area Schools*, No. 05-74439, 2007 WL 4201137, at *1–4 (E.D. Mich. Nov. 28, 2007) (finding that harassment including "slurs such as 'fag,' 'faggot,' 'gay,' 'fat pig,' 'man boobs,' 'queer," and 'Mr. Clean'—a reference to [the victim's] lack of pubic hair" and incidents of "teabagging" in which a naked student shoved his penis against the victim's face in the locker room rose to the level of severe, pervasive, and objectively offensive conduct); *see also Theno v. Tonganoxie Unified Sch. Dist. No. 464*, 377 F. Supp. 2d 952, 966 (D. Kan. 2005) (finding that harassment including "slurs, such as 'fag' and 'jack off boy,' and ridicule, such as when another student put string cheese in his mouth and said, 'I'm Dylan sucking cock'" constituted severed and objectively offensive conduct).

In addition, harassment due to a victim's *perceived* homosexuality is sufficient to constitute "sexual harassment," regardless of whether the victim is in fact gay.  *See*, *e.g.*, *Ray*, 107 F. Supp. 2d at 1170 (finding it reasonable to believe that plaintiff student was harassed *on the basis of sex* where the student's mother was a transgendered female and there was a "widespread, general perception that [the student] was homosexual").  Here, the Complaint alleges numerous instances of sexual harassment that lasted throughout Asher's middle school

years.  The allegations rise to the level of severe, pervasive, and objectively offensive conduct actionable under Title IX.

Finally, the Complaint adequately alleges that the offensive conduct deprived Asher of access to an educational opportunity.  Not only does Truong contend that the repeated and unchecked instances of sexual harassment led to Asher's depression and, ultimately, his suicide, but the bullying allegedly caused Asher to miss out on educational opportunities during his middle school years.  In one notable example, the Complaint alleges that Asher was bullied in class while TAKS testing—the annual, state-mandated Texas Assessment of Knowledge and Skills test—was ongoing.  (*Id.* ¶ 133.)  The bullying was so severe that Asher had to hide under his desk and cover his head with a jacket during the test.  (*Id.*)  Truong has alleged far more than mere "student 'teasing or bullying'" that Defendants apparently consider too lighthearted to constitute a violation of Title IX.  (Doc. No. 18, at 36.)  To the contrary, the Complaint alleges exactly the type of severe, pervasive, and objectively offensive sex-based harassment that Title IX seeks to prevent.

### 4. *Deliberate indifference*

CFISD argues that Truong seeks to hold the Board liable for actions taken by students instead of any definitive action by Defendant.  Defendant is incorrect.  Instead, like the plaintiff in *Davis*, Truong "attempts to hold the Board liable for its *own* decision to remain idle in the face of known student-on-student harassment in its schools."  *Davis*, 526 U.S. 629, 641 (1999).  Liability thus arises not from the students' harassment of Asher but from "an official decision by the [School Board] not to remedy the violation."  *Davis*, 526 U.S. at 642 (quoting *Gebser*, 524 U.S. at 290).  To succeed on her Title IX claim, Truong must demonstrate that CFISD acted with "deliberate indifference" in either acting or failing to act to protect Asher from the gender-based

harassment he suffered.  To constitute deliberate indifference, a school district's actions must be "clearly unreasonable in light of the circumstances" and the actions of the school must "subject" the student to harassment or, at a minimum, make the victim vulnerable to harassment.  *Davis*, 526 U.S. at 640–41.

The bar for avoiding Title IX liability is surprisingly low; a school board need not necessarily expel harassers or even remedy harassment.  *Davis*, 526 U.S. at 648–49.  Instead, a board "must merely respond to known peer harassment in a manner that is not clearly unreasonable" under the circumstances.  *Id.* at 649.  What the School Board may not do is do nothing.  Here, Truong alleges that, not only did school officials rebuff her attempts to make contact with officials in a position to take action to curb Asher's suffering, the school officials did absolutely nothing to address the numerous incidents of bullying Asher faced, and reported, on CFISD's campus.

The Complaint alleges numerous incidents of CFISD's inaction in the face of Asher's victimization.  Truong and Asher's step-father spoke directly to school personnel, including the sixth and seventh grade counselors, the main receptionist, school administrators, the gym coaches, and the eighth grade principal, about the instances of bullying against Asher.  (Compl. ¶¶ 96, 99, 102–03, 108, 110, 112–13, 116, 118–19, 121, 123.)  CFISD personnel represented to Truong that they would look into or handle the bullying allegations, but no action was taken.  (*Id.* ¶¶ 100, 110, 117, 119, 122).  David confronted Asher's coaches directly, Asher alerted his coaches immediately after bullying incidents occurred during gym class, and other students informed the coaches about Asher's falling victim to bullying during gym class.  (*Id.* ¶¶ 103, 105, 110, 115.)  The various coaches took no action.  (*Id.*)  In addition to the Truongs' attempted oral communication with CFISD personnel, Amy also sent notes for Asher to deliver, and Asher

himself filed incident reports, in accordance with the school's policy for reporting concerns.  (*Id.* ¶¶ 100, 102, 105, 113.)   On the one occasion when Amy did receive a returned call from Assistant Principal Alan Durham, Durham merely stated that he would investigate her concerns and then never followed-up.  (*Id.* ¶ 117.)

A school board's deliberate indifference to known acts of harassment is sufficient to amount to an intentional violation of Title IX where the indifference "subjects" a student to harassment.  *Davis*, 526 F.3d at 644–45.  Further, a school district acts unreasonably for purposes of Title IX liability where the school continues to rely on ineffective policies to address harassment.  *See*, *e.g.*, *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 261 (6th Cir. 2000) ("Where a school district has actual knowledge that its effort to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances."); *see also Patterson v. Hudson Area Sch.*, 551 F.2d 438 (6th Cir. 2009) (finding a genuine issue of fact existed over whether or not the school officials had actual knowledge that the methods for handling sexual harassment were ineffective and continued to use the same methods).   Given the severity and offensive form the harassment took here, the lengthy duration of the bullying, and the numerous times and methods Asher and his family attempted to gain relief from CFISD, the Complaint gives rise to a plausible claim that CFISD's failure to respond to the severe sexual-perception based harassment of Asher was unreasonable and constituted the deliberate indifference contemplated for liability under Title IX.

In sum, the Complaint sufficiently pleads all of the factors enumerated by the Supreme Court in *Davis v. Monroe County Board of Education*.   Therefore, Truong adequately states a cause of action for sex discrimination under Title IX.

### iii. Rehabilitation Act Claim

The Rehabilitation Act provides that qualified individuals with disabilities may not be excluded from participation in, denied the benefits of, or be subjected to discrimination under any program or activity receiving federal funds.  29 U.S.C. § 794(d).  Section 504, in conjunction with regulations promulgated by the Department of Education, governs disability discrimination in the elementary education context.  *See* Pub. L. 93-112, as amended, § 504; 34 C.F.R. § 104.1-10.  Relief under Section 504 requires a plaintiff to demonstrate that he was (1) a qualified individual, (2) with a disability, (3) excluded from participation in, denied the benefits of, or subjected to discrimination, (4) under any program or activity, (5) operated by a school district (6) receiving federal funds.  *Id.*  The Rehabilitation Act defines an individual with a disability as a person who has a physical or mental impairment that "substantially limits one or more of such person's major life activities."  *Hileman v. City of Dallas, Texas*, 115 F.3d 352, 353 (5th Cir. 1997) (quoting 29 U.S.C. § 706(8)(B)).

Defendant argues that Plaintiff has failed to comply with the administrative exhaustion procedures set out in the Individuals with Disabilities Education Act ("IDEA") that are a prerequisite to bringing a claim under the Rehabilitation Act.  (Doc. No. 18, at 38.)  Defendant further asserts that, even if Plaintiff's compliance with the exhaustion requirements is not required, Plaintiff has nonetheless failed to state a claim under the Rehabilitation Act because the Complaint contains no allegations that CFISD discriminated against Asher on the basis of any disability.  (*Id.*)

The Rehabilitation Act requires plaintiffs to comply with the same procedural constraints—including administrative exhaustion requirements—as Title VII.  *See Prewitt v. United States Postal Serv.*, 662 F.2d 292, 304 (5th Cir. 1981).  The IDEA permits parents to

34

challenge educational decisions made by schools for disabled children and funnels any challenges to the schools' decision-making through an administrative hearing and appeals process.  20 U.S.C. § 1415(f)-(i).  Here, Plaintiff concedes that she did not make use of the administrative appeals process, but argues that any attempt to do so now would be futile following Asher's death.  (Doc. No. 27, at 9.)

Defendant raises both jurisdictional and substantive challenges to Plaintiff's Rehabilitation Act claim.  In considering whether Plaintiff should have availed herself of the administrative procedures available under the IDEA, the Court is unable to determine *when* CFISD allegedly discriminated against Asher on the basis of his disability and, therefore, when the statute of limitations for any such administrative process would have commenced.  The absence of any such allegation reflects the fatal flaw in the Complaint for both 12(b)(1) and 12(b)(6) analyses.  Even if the Court were to find that Truong could bypass the administrative procedure required for claims under the Rehabilitation Act, the Complaint simply does not allege any instance in which CFISD discriminated against Asher on the basis of his disability.

The allegations in the Complaint relate to the sex-based harassment perpetrated against Asher by his peers and CFISD's failure to take appropriate action in response.  While the Complaint states that Asher was diagnosed with Asperger's Syndrome in 2007, the Complaint nowhere alleges any connection between Asher's disability and any action or inaction by CFISD. (Compl. ¶¶ 4, 94); *see also Soledad v. U.S. Dept. of Treasury*, 304 F.3d 500, 503–04 (5th Cir. 2002) (explaining that, under the Rehabilitation Act, a victim must show that he or she was denied benefits or subjected to discrimination *solely* by reason of his or her disability); *Baker v. Univ. of Tex.*, 2011 WL 1549263, at *5 (S.D. Tex. April 21, 2011) (explaining that a prima facie case of disability discrimination requires proof that the discrimination occurred "by reason of

[her] disability") (citation omitted).  In fact, the Complaint does not even allege that CFISD was every informed of Asher's Asperger's diagnosis.  While Plaintiff need not plead a prima facie case at this juncture, Rule 8(a)(2) still requires a "showing," rather than a blanket assertion, of entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 1965 n.3 (2007).  Because the Complaint pleads no facts implying that Asher was discriminated against by CFISD on the basis of his alleged disability, the Complaint fails to adequately state a claim under the Rehabilitation Act as required under Rule 8.

### c.  Motion to Strike

As an alternative to their motion to dismiss, Defendant asks this Court to strike from the Complaint a thirteen page section providing a "history" of bullying and student suicides in the United States, which Defendant considers to be inflammatory.  (Doc. No. 18, at 44.)  Although Rule 12(f) permits a court to strike "immaterial" and "impertinent" material from a complaint, Defendant asks that the Court do so here only if Plaintiff is given leave to amend her Complaint.  (*Id.*)  Because the Complaint adequately pleads causes of action under Title IX and section 1983, Plaintiff is not granted leave to amend and Defendant's motion to strike is moot.

## IV.    CONCLUSION

The Court determines that Truong has sufficiently demonstrated that she has both the standing and capacity to bring this action.  Accordingly, Defendant's motion to dismiss under Rule 12(b)(1) is **DENIED**.  Further, the Court **DENIES** Defendant's motion to dismiss under Rule 12(b)(6) with respect to Plaintiff's Title IX claim and due process claim brought under section 1983 but **GRANTS** Defendant's motion with respect to Plaintiff's First Amendment, Equal Protection, and Rehabilitation Act claims.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 21st day of February, 2012.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE